IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| M.B. BARGE CO., INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION 12-0686-WS-N |
| | ) |
| KUDZU MARINE, INC., et al., | ) |
| | ) |
| Defendants. | ) |

# ORDER

This matter is before the Court on a motion for summary judgment filed by defendants Specialty Fuels, Inc. ("the Corporation"), Specialty Fuels Bunkering, LLC ("Bunkering"), Specialty Fuels BTU, LLC ("BTU") (collectively, "the Specialty defendants"), and F. Javier Brito. (Doc. 103). Also pending are motions for summary judgment filed by defendants Robert J. Tompkins, Jr. and Michael S. Wilson. (Docs. 106, 110).[1] The parties have submitted briefs and evidentiary materials in support of their respective positions, (Docs. 104-05, 116-17), and the motions are ripe for resolution. After careful consideration, the Court concludes that the motions of the individual defendants and Bunkering are due to be denied and that the motion of BTU and the Corporation is due to be granted in part and denied in part.

# BACKGROUND

According to the second amended complaint, (Doc. 49), in April 2010 and December 2011, the plaintiff entered two bareboat charter agreements ("the Contracts")

---

[1] Tompkins and Wilson rely exclusively on the briefing, exhibits and other materials submitted by the Specialty defendants and Brito. (Docs. 107-08, 111-12). Accordingly, the Court will refer to arguments and evidence as having been presented by "the defendants" as a group.

with defendant Kudzu Marine, Inc. ("Kudzu"). Brito, Tompkins and Wilson ("the Shareholders") were and are Kudzu's only shareholders. Kudzu was created and operated solely to provide barge services to the Specialty defendants, all of which are owned by Brito.

According to the second amended complaint, Kudzu defaulted on its payment and other obligations under the Contracts, to the tune of approximately $600,000. The plaintiff initiated this action against Kudzu in October 2012, setting forth a single count for breach of contract. (Doc. 1). Kudzu filed for bankruptcy in August 2013, and the action as to Kudzu has been stayed since then. (Docs. 42, 43).

According to the second amended complaint, Kudzu owned several vessels, which it sold for substantially less than their fair market value but for enough to result in the cancellation of the Shareholders' guaranties related to the vessels' purchase. The sales liquidated essentially all of Kudzu's assets and left Kudzu insolvent. The sales occurred after this action was commenced and with notice that the plaintiff would seek to enforce against the vessels any judgment obtained in this action.

In April 2013, the plaintiff filed an amended complaint, which added the Specialty defendants as parties and asserted counts against them for breach of contract and "alter ego." (Doc. 23). In September 2013, the plaintiff filed its second amended complaint, which added the Shareholders as defendants and asserted counts against them for breach of contract and "piercing the corporate veil." The movants seek summary judgment as to all counts against them.

**DISCUSSION**

Summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). The moving party may meet its burden in either of two ways: (1) by

"negating an element of the non-moving party's claim"; or (2) by "point[ing] to materials on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden." *Id*. "Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial." *Id*.; *accord Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000); *Sammons v. Taylor*, 967 F.2d 1533, 1538 (11th Cir. 1992).

"If the party moving for summary judgment fails to discharge the initial burden, then the motion must be denied and the court need not consider what, if any, showing the non-movant has made." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993); *accord Mullins*, 228 F.3d at 1313; *Clark*, 929 F.2d at 608.

"If, however, the movant carries the initial summary judgment burden ..., the responsibility then devolves upon the non-movant to show the existence of a genuine issue of material fact." *Fitzpatrick*, 2 F.3d at 1116. "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Clark*, 929 F.2d at 608 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted); *see also* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may … consider the fact undisputed for purposes of the motion ….").

In deciding a motion for summary judgment, "[t]he evidence, and all reasonable inferences, must be viewed in the light most favorable to the nonmovant …." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003).

There is no burden on the Court to identify unreferenced evidence supporting a party's position.[2] Accordingly, the Court limits its review to the exhibits, and to the specific portions of the exhibits, to which the parties have expressly cited. Likewise,

---

[2] Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."); *accord Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 672 (10th Cir. 1998) ("The district court has discretion to go beyond the referenced portions of these [summary judgment] materials, but is not required to do so.").

"[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment," *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995), and the Court accordingly limits its review to those arguments the parties have expressly advanced.

 **I. Breach of Contract (Counts Two and Three).**

The only contracts on which suit is brought are the Contracts referenced above. By their express terms, the only parties to the Contracts, and the only signatories to the Contracts, are the plaintiff and Kudzu. (Doc. 49-1 at 1, 16; Doc. 49-2 at 1, 12). The defendants, citing Alabama law, argue that one must be a party to a contract in order to be liable for its breach, and they point to the Contracts as disproving that any of them was a party. (Doc. 104 at 9-11).

As reasonable as the movants' position appears, it is insufficient to support summary judgment. First, the Contracts by their terms are not governed by Alabama law but by general maritime law and/or Louisiana law,[3] which the defendants have not addressed. Second, Count Two seeks to hold the Specialty defendants liable under a theory of assignment or novation, (Doc. 49 at 12), and the movants have not attempted to demonstrate that the plaintiff cannot prove such an occurrence or that applicable law would not permit a contract claim based on such a theory. Similarly, Count Three seeks to hold the Shareholders liable on the grounds that they fraudulently transferred Kudzu's vessels with the intent to hinder, delay and/or defraud the plaintiff, (*id*. at 13), and the movants have not attempted to demonstrate that a breach of contract claim cannot be based on such conduct under applicable law.

The plaintiff in its brief does not address or defend its contract claims. This is probably for the excellent reason that, at the end of the day, it has no viable contract claims against the defendants. On the other hand, the plaintiff has not expressly withdrawn these claims, and its failure to address them furnishes no grounds to excuse

---

[3] (Doc. 49-1 at 16; Doc. 49-2 at 12).

the defendants' failure to satisfy their initial burden on motion for summary judgment. *E.g., Polion v. City of Greensoro*, ___ F. Supp. 2d ___, 2014 WL 2611562 at *18 (S.D. Ala. 2014). Given that failure, the defendants cannot receive summary judgment on the contract claims against them.[4]

## II. Alter Ego (Count Four).

The parties agree that Alabama law governs this claim. (Doc. 104 at 11-12; Doc. 116 at 23). As the plaintiff acknowledges, (*id*. at 20-21), liability under an alter ego theory requires: "complete control" by the defendant over the subservient corporation; (2) "misuse" of that control; and (3) harm or loss proximately caused by the misused control. *Messick v. Moring*, 514 So. 2d 892, 894-95 (Ala. 1987).

The plaintiff argues there is evidence "the Specialty Fuel Entities": (1) had common directors with Kudzu; (2) were financing Kudzu's operations; (3) paid Kudzu's expenses; (4) were Kudzu's only customers; and (5) used Kudzu's property as their own. In addition, the plaintiff asserts that Kudzu's officers and directors "acted at the behest of the Specialty Fuels Entities." (Doc. 116 at 2). In fact, all of the plaintiff's evidence of control relates exclusively to Bunkering.[5] Bunkering, however, is in bankruptcy, and the parties have not sought or received relief from the automatic stay so as to prosecute or defend the claims against Bunkering in this action.[6]

---

[4] Of course, Rule 11 has something to say about the continued pursuit of claims known to be untenable. *E.g., Phonometrics, Inc. v. Economy Inns of America*, 349 F.3d 1356, 1363 (11th Cir. 2003).

[5] The deposition testimony of Wilson and of Sara Shipman Myers, (Doc. 116-2, -4), is clear on this. In questioning Tompkins, (Doc. 116-3), counsel used the term "Specialty Fuels," but the context, as well as the parallel questioning of Wilson and Myers, make clear that counsel used the term to denote Bunkering, not all three entities collectively. The plaintiff offers no argument to the contrary.

[6] Shortly after the suggestion of bankruptcy was filed, the plaintiff notified the Court that it would seek relief from the automatic stay solely for the limited purpose of conducting discovery in this action, with "any litigation of its claims specifically against [Bunkering to] be handled, if necessary, in the bankruptcy proceeding." (Doc. 73 at 1). The plaintiff obtained such relief, which defense counsel misconstrued as an entire lifting of the automatic stay, leading to

As to BTU and the Corporation, the evidence does not support an alter ego theory. It is uncontroverted that BTU's only business relationship with Kudzu was as a lessee of office space and that, after 2007, BTU "for the most part, was nonexistent." (Doc. 104-1 at 64-66). It is also uncontroverted that the Corporation paid Kudzu to transport its materials only from 2006 to 2009. (Doc. 104-1 at 94-95). The plaintiff has identified no evidence to establish a stronger relationship between BTU or the Corporation and Kudzu, and no evidence of any relationship at all in or after 2010, when the plaintiff and Kudzu entered their first Contract. On the contrary, the plaintiff stresses that, from 2010 through 2012, Bunkering was "effectively the only customer" of Kudzu. (Doc. 116 at 11).

On this record, the plaintiff cannot demonstrate the existence of a genuine issue of material fact as to whether BTU or the Corporation was an alter ego of Kudzu. There is no evidence that either entity exercised any control (much less complete control) over Kudzu, or that they misused any control they had, or that any such misuse –which could not have occurred after 2009 – proximately caused the plaintiff's losses in a relationship it did not enter until 2010.

## III. Piercing the Corporate Veil (Count Five).

Alabama[7] recognizes "three theories under which a party might seek to pierce the veil of a corporate defendant: (1) inadequacy of capital; (2) fraudulent purpose in conception or operation of the business; and (3) operation of the corporation as an instrumentality or alter ego." *Heisz v. Galt Industries, Inc.*, 93 So.3d 918, 929-30 (Ala.

---

Bunkering's motion for summary judgment. (Doc. 123). The plaintiff, in turn, opposed Bunkering's motion for summary judgment on the assumption that, by filing the motion, Bunkering had "waived" the protection of the automatic stay. (Doc. 122 at 2).

[7] The parties agree to utilize Alabama law in resolving this claim. (Doc. 104 at 18; Doc. 116 at 28).

2012). The second amended complaint invokes the first two of these theories against the Shareholders. (Doc. 49 at 15-16).[8]

The plaintiff's evidence is as follows. As of June 2012, Kudzu was doing work only for Bunkering. At that time, Bunkering ceased doing business with Kudzu, leaving Kudzu with no income to pay the plaintiff. Kudzu ceased operations in July 2012. (Doc. 116-2 at 56; Doc. 116-3 at 100 ).

On October 23, 2012, the plaintiff through counsel sent written notice to Kudzu that it was in breach of the Contracts by failure to make payments for July-October in the approximate amount of $88,000. The plaintiff noted that the Contracts extended until April 2013 and December 2014, respectively, that Kudzu was liable for those future payments, and that total damages thus would be much larger than the $88,000 then in arrears. On October 26, 2012, the plaintiff sent Kudzu a second letter warning Kudzu not to dispose of any of its assets and threatening to seek injunctive relief to prevent such disposition. (Docs. 116-9, -10).

In October 2012, Kudzu owned several vessels, most importantly the tugboat Russell T and the barge KDZ 1801. Both vessels had been purchased with borrowed money, with Bunkering (which Brito owned) providing a guaranty on the Russell T loan and all three Shareholders providing personal guarantees on the KDZ 1801 loan. (Doc. 116-2 at 32; Doc. 116-3 at 96; Doc. 116-4 at 19-20, 34-35).

On October 22, 2012, Chris Gonsoulin, who was associated with the plaintiff, submitted to Kudzu a proposed brokerage agreement, pursuant to which he would help Kudzu sell the vessels so as to maximize the sales price and provide funds to pay the plaintiff. Kudzu declined to enter the agreement. (Doc. 116-2 at 187; Doc. 116-3 at 290, 319).

In October 2012, the outstanding debt on the Russell T was approximately $196,000 and its fair market value (based on an October 2012 appraisal) approximately

---

[8] The plaintiff's brief attempts to inject the "alter ego" theory into its case against the Shareholders. (Doc. 116 at 19-20, 26-28). The defendants object that no such theory is preserved by the second amended complaint. (Doc. 118 at 6-8). The Court agrees and will not consider the plaintiff's argument.

$450,000. On October 25, 2012, Kudzu sold the Russell T for $207,000. The proceeds of the sale were used to pay off the loan on the vessel and thus release all guaranties. (Doc. 116-3 at 84; Doc. 116-4 at 35; Doc. 116-12 at 6).

In May 2013, the outstanding debt on the KDZ 1801 was approximately $460,000; its fair market value when purchased in April 2009 was approximately $1,433,000. On May 29, 2013, Kudzu sold the KDZ 1801 for exactly the amount of the debt on the vessel. Indeed, the purchase agreement expressly stated the purchase price as "an amount sufficient to discharge the present ship mortgage held on said vessel by Iberia Bank at the time of closing of said sale," with that figure then calculated to the penny. (Doc. 116-14 at 1; Doc. 116-6 at 13).

The KDZ 1801 was purchased by Lanac Investments, LLC ("Lanac"). Prior to the sale, Brito reached a secret agreement with Lanac, pursuant to which Brito would own a 50% interest in the KDZ 1801 (or any entity owning it). Brito also secretly provided Lanac a personal guaranty of 50% of the purchase price. (Doc. 116-14 at 1; Doc. 116-18 at 1-2).

The sale of the vessels left Kudzu with essentially no assets with which to pay the plaintiff. In August 2013, Kudzu filed for bankruptcy. It listed total assets of $0.00, total liabilities of under $50,000, and no liabilities related to the purchase of the Russell T or KDZ 1801. (Doc. 116-20 at 3-4, 10-13).

To summarize, the plaintiff has evidence that, in October 2012, the Shareholders knew that Kudzu was almost $90,000 in arrears to the plaintiff, that this figure was bound to go much higher, and that Kudzu had no income with which to pay its obligations to the plaintiff. The Shareholders also had secured debt of approximately $656,000 on the two vessels, again with no income stream from which to make payments. But the Shareholders also knew the two vessels were worth much more than $656,000 and that their sale for anything approaching fair market value would likely satisfy all of Kudzu's creditors, including the plaintiff. Nevertheless, the Shareholders sold the vessels for just enough to pay off the debt on them – which, conveniently enough, eliminated their personal guaranties and that of Brito's company – and did so after refusing the plaintiff's

8

assistance in obtaining better prices. The Shareholders did so while knowing of the plaintiff's threat to seek an injunction against their disposition of the vessels – which injunction could have exposed them to liability on their guaranties. The result was to fully protect the Shareholders while gratuitously leaving the plaintiff fully exposed. Brito's conduct goes even further than that of his co-defendants, because he secretly gained 50% ownership of the KDZ 1801 at a bargain-basement price.

The Shareholders do not deny that, once they liquidated Kudzu's assets at below-market prices, Kudzu became under-capitalized. (Doc. 104 at 19-20). Instead, they note that "[t]he fact that a corporation is under-capitalized is not alone sufficient to establish personal liability." *Simmons v. Clark Equipment Credit Corp.*, 554 So. 2d 398, 400 (Ala. 1989). The Shareholders are correct, but in its very next sentence the *Simmons* Court clarified what more is needed: "To pierce the corporate veil, a plaintiff must show fraud in asserting the corporate existence or must show that recognition of the corporate existence will result in injustice or inequitable consequences." *Id*. The question is whether the Shareholders' conduct (as viewed from the plaintiff's evidence) in draining off Kudzu's assets shows fraud or would result in injustice or inequity if uncorrected.

In *Cohen v. Williams*, 318 So. 2d 279 (Ala. 1975), the plaintiff obtained a judgment against the defendant's corporation. The defendant dissolved the corporation (without observing legal niceties), after which he assumed personal responsibility for all corporate liabilities except the plaintiff's judgment. *Id*. at 280-81. The Supreme Court ruled that these circumstances justified piercing the corporate veil:

> The complaint alleges and the answer admits that plaintiff first sought to collect the judgment from the corporation. Because of Cohen's 'dissolution' of the corporation, there were no assets from which the judgment could be collected. Cohen personally assumed liability for all corporate debts except the judgment. By the 'dissolution' he sought to evade the judgment. These are precisely the type of acts which a court in the exercise of its inherent equitable powers may view to differentiate the form from the substance.

*Id*. at 281. The plaintiff points to *Cohen* as supporting its claim against the Shareholders. (Doc. 116 at 28-30). The Shareholders offer several objections. (Doc. 118 at 8-11).

9

They first argue that *Cohen* "presented a much stronger case" for piercing the corporate veil than this case, because there was evidence the defendant had commingled corporate and personal assets and had not complied with corporate formalities. (Doc. 118 at 8). These features are present in *Cohen*, 318 So. 2d at 280, but the focus of the Court's opinion "was evidence that the impending Burrell judgment against the corporation caused [the defendant] to 'dissolve' the corporation and assume personal responsibility for corporate liabilities, save and except the Burrell judgment." *Id*. at 281. Indeed, when the defendant urged the Court to focus on the corporation's operation prior to the judgment, the Court described the argument as "misconceiv[ing] the issue" and redirected its attention to the defendant's conduct in dissolving the corporation. *Id*.

The Shareholders next point out that *Cohen* involved the dispersal of corporate assets after being cast in judgment, while in this case no judgment has yet been entered. (Doc. 118 at 8). This is, as the Shareholders say, a "distinction," (*id*.), but it does not appear to be one that makes a difference. The Shareholders sold the Russell T with awareness that Kudzu was about to be sued and then sold the KDZ 1801 seven months after being sued. In both instances, they acted in the shadow of an impending judgment.

Finally, the Shareholders note that, in *Cohen*, "[b]y 'dissolution' [the defendant] sought to evade the judgment," 318 So. 2d at 281, and they insist the evidence negates any intent by them to avoid Kudzu's liability to the plaintiff. (Doc. 118 at 8-9). The Court cannot agree. The evidence recounted above supports an inference that the Shareholders purposely limited the sales price of the two vessels so as to eliminate any surplus to apply to Kudzu's debt to the plaintiff, knowing there was no other means of satisfying that debt. As in *Cohen*, the Shareholders disposed of the corporation's assets and used them to satisfy other corporate debts to the exclusion of the plaintiff's debt.

The Shareholders suggest they could not have harbored a purpose of stiffing the plaintiff because they took "the best offer[s] on the table at the time." (Doc. 104 at 21). The plaintiff's evidence, however, suggests that better offers could have been obtained, that the Shareholders did little if anything to generate such offers, and that they refused the plaintiff's assistance in obtaining such offers, even though they apparently were not in

10

imminent danger of having their guaranties called.  The Shareholders' argument rings particularly hollow with respect to the KDZ 1801, where Brito directly profited by holding the sales price as low as possible.  Blaming the plaintiff for not producing higher offers after Gonsoulin was rebuffed by the Shareholders, (Doc. 118 at 9), does not excuse the Shareholders' inaction and self-dealing.

In a similar vein, the Shareholders complain that the plaintiff has identified no evidence that the vessels could have been sold for more than they fetched.  (Doc. 104 at 20).  Two problems here.  First, the plaintiff has evidence that the fair market value of the Russell T, based on an appraisal contemporaneous with the sale, was more than double its sales price; similarly, the plaintiff has evidence that the purchase price of the KDZ 1801 in 2009 was more than triple its sales price in 2013.  The Shareholders do not explain how this economic data could fail to constitute evidence that the vessels could have been sold for more than their lien/guaranty amounts.  Second, the Shareholders' burden on motion for summary judgment is to point out, by reference to materials on file, that the plaintiff cannot produce evidence in support of its claim.  Simply positing that the plaintiff cannot do so does not meet the Shareholders' burden.

At any rate, the Shareholders have not demonstrated that a purpose of evading payment of Kudzu's debt to the plaintiff is a *sine qua non* of piercing the corporate veil.  As noted, all that is required is under-capitalization under circumstances such that "recognition of the corporate existence will result in injustice or inequitable consequences." *Simmons*, 554 So. 2d at 400.  The Court agrees with the Shareholders, (Doc. 118 at 9), that selling secured corporate assets and paying off the associated secured loans from the proceeds is in general a reasonable practice.  The question, though, is whether it was just and equitable for the Shareholders to liquidate the only corporate assets at fire-sale prices, being careful to match the sales price to the amount of their personal guaranties, and leave the plaintiff out to dry simply because they had no personal incentive to do more (and, at least in Brito's case, had incentive not to do more).  The Court does not answer this question in the affirmative, it simply notes that the

Shareholders – who bear the initial burden on motion for summary judgment – have not shown that the answer must be in the negative.

In an apparent but unstated effort to shift the equities, the Shareholders note that the plaintiff voluntarily chartered two barges to Kudzu. (Doc. 118 at 10). "Voluntary creditors of corporations are held to a higher standard because they are generally able to inspect the financial structure of a corporation and discover potential risks of loss before any transaction takes place. Consequently, courts are less sympathetic with voluntary creditors who, having had the opportunity of inspection, nevertheless elected to transact with an undercapitalized corporation." *Co-Ex Plastics, Inc. v. AlaPak, Inc*., 536 So. 2d 37, 39 (Ala. 1988) (internal quotes omitted). The Shareholders trumpet this quotation, but it is inapposite. The plaintiff did not enter contracts with an under-capitalized corporation without engaging in due diligence to discover that fact; the plaintiff entered contracts with a fully capitalized corporation that, years later, chose to become under-capitalized by selling its assets at a fraction of their value. The Shareholders have not shown that Alabama law disfavors creditors lacking clairvoyance. Likewise, they have not shown that the plaintiff's failure to obtain personal guaranties from the Shareholders precludes them from piercing the corporate veil. (Doc. 104 at 21).

## CONCLUSION

For the reasons set forth above, the motion for summary judgment as to Bunkering is **denied** without consideration in light of the automatic stay; the motion for summary judgment as to BTU and the Corporation is **granted** with respect to Count Four and **denied** with respect to Count Two; and the motions for summary judgment as to the Shareholders are **denied**.

DONE and ORDERED this 6th day of October, 2014.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE